# Illinois Official Reports

## Appellate Court

*Bank of America v. WS Management, Inc.*, 2015 IL App (1st) 132551

| | |
|---|---|
| Appellate Court Caption | BANK OF AMERICA, Plaintiff-Appellant and Cross-Appellee, v. WS MANAGEMENT, INC., WILLIAM SPATZ, WENDY SPATZ, SPATZ CENTERS, INC., and ANDERSON ASSOCIATES, L.P., Defendants-Appellees and Cross-Appellants. |
| District & No. | First District, First Division<br>Docket No. 1-13-2551 |
| Filed | May 18, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CH-10267; the Hon. Richard J. Billik and the Hon. Rodolfo Garcia, Judges, presiding. |
| Judgment | Affirmed in part; vacated and remanded in part. |
| Counsel on Appeal | David T.B. Audley, Michael T. Benz, Bryan E. Jacobson, and Mark A. Silverman, all of Chapman & Cutler LLP, of Chicago, for appellant.<br><br>Alisa M. Levin, of Levin Law, Ltd., of Chicago, for appellees. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion. |

¶ 1        Plaintiff, Bank of America, appeals from orders of the circuit court that declined to find that spouses William Spatz (William) and Wendy Spatz (Wendy) were alter egos of Spatz Centers, Inc. (SCI), and WS Management, Inc. (WSM). Defendants, William, Wendy, SCI, WSM, and Anderson Associates, L.P. (Anderson), cross-appeal, contending: (1) the trial court should have found that certain facts and issues were precluded by collateral estoppel; (2) the trial court erred in finding that defendants violated the Uniform Fraudulent Transfer Act (Fraudulent Transfer Act) (740 ILCS 160/1 *et seq.* (West 2006)); and (3) the trial court improperly awarded attorney fees to plaintiff. We affirm the court's judgment on the collateral estoppel, Fraudulent Transfer Act, and alter ego claims, and vacate and remand on the issue of plaintiff's attorney fees.

¶ 2        As preliminary background, this case concerns plaintiff's efforts to collect a judgment that was entered against SCI in Kansas in December 2005. At various times, William or Wendy had been a shareholder or otherwise involved in SCI, which was incorporated in 1989 in Illinois and had been the general partner or manager for a group of limited partnerships, which in turn owned various shopping centers around the country. SCI's business of managing the shopping center properties generated fees for SCI. In 1997, one of the limited partnerships for which SCI was the general partner, Wichita Associates, L.P. (WALP), which did business in Kansas, executed a note with an entity of which plaintiff is the successor. WALP eventually defaulted on its obligations under the mortgage and other loan documents, and at the end of the resulting foreclosure proceedings in Kansas, plaintiff received a judgment in December 2005 against WALP and SCI jointly and severally for $1,490,708.32, which included attorney fees, costs, and expenses. WSM was incorporated in Illinois on December 12, 2005, and soon after began managing certain properties that SCI had previously managed. Anderson allegedly began managing certain properties in 2007. Meanwhile, plaintiff registered the Kansas judgment in Illinois in January 2006. Plaintiff subsequently filed a separate action alleging various claims relating to William's and Wendy's supposed efforts to avoid paying the Kansas judgment.

¶ 3                                    I. BACKGROUND
¶ 4                            A. Kansas Foreclosure Proceedings
¶ 5        We first provide a summary of William and SCI's involvement in the Kansas foreclosure proceedings. WALP's note with the bank listed WALP as the maker and was signed by SCI as WALP's general partner, with Wendy signing as SCI's vice president. The note also indicated that if it became necessary to employ counsel to collect or enforce the debt or protect or foreclose the security for the debt, "Maker also shall pay on demand all costs of collection incurred by [the bank], including attorneys' fees and costs reasonably incurred for the services of counsel whether or not suit be brought." On November 30, 2004, William signed an affidavit in support of a stipulated application for an appointment of a receiver for the property. SCI was added as a defendant in the foreclosure case on February 22, 2005, when the bank filed a first amended petition for declaratory judgment and other relief. A certificate of service indicated that a copy of the first amended petition was sent to William. On May 6, 2005, SCI filed an answer to the first amended petition. On June 28, 2005, a

journal entry of judgment was entered against WALP. Subsequently, the property was sold to the bank for $1.2 million, which was applied to the judgment.

¶ 6    On October 28, 2005, the bank filed a motion for partial summary judgment against SCI. In part, the bank sought payment of the unpaid principal balance on the note, which was approximately $1.4 million. The bank asserted that SCI as the general partner of WALP was jointly and severally liable for WALP's obligations. The bank also stated that WALP had failed to maintain its status as a separate, single-purpose entity, and as a result, WALP's debt obligation became fully recourse according to the language of the mortgage.

¶ 7    In response, SCI and WALP acknowledged that because of a failure to file an annual report in July 1999, WALP had forfeited its good-standing status in Kansas. However, WALP and SCI asserted that WALP had applied for and expected to be granted reinstatement of its good-standing status in Kansas, and upon reinstatement, should be treated as if its good-standing status had never lapsed.

¶ 8    On December 1, 2005, the Kansas court issued its ruling, stating that WALP had failed to maintain its status as a separate, single-purpose entity pursuant to the terms of the loan documents and that SCI and WALP failed to preserve WALP's existence. The court further stated that "[i]ssues concerning WALP's recent attempts to obtain reinstatement of its authorization to conduct business in Kansas *** are immaterial." The court also found that as WALP's general partner, SCI was jointly and severally liable for all of WALP's debts, obligations, and judgments. Accordingly, a judgment was entered against SCI and WALP jointly and severally for $1,490,708.32, which included $32,057.50 in attorney fees and expenses and $1,325.86 in costs. The ruling indicated that the judgment amount would also include "other expenses accrued and accruing, including reasonable attorneys' fees, insurance premiums, taxes, and assessments" pursuant to the terms of the note and that the judgment would accrue interest at the rate of $322.78 per day. The court also stated that plaintiffs had incurred and would continue to incur substantial costs in attempting to collect from WALP, including the cost of instituting the Kansas suit and "reasonable attorneys' fees related to [plaintiff's] collection efforts." A final order was entered on December 30, 2005. SCI and WALP subsequently appealed the judgment, but upon their motion, the appeal was dismissed on March 1, 2006.

¶ 9                                    B. Motion for Turnover Against Wendy

¶ 10    Plaintiff registered the Kansas judgment in Illinois in January 2006 under case number 06 M1 600238, and citation proceedings involving SCI, William, and Wendy began. On September 18, 2008, plaintiff filed a motion for a turnover order against Wendy on September 18, 2008, seeking to order Wendy to pay plaintiff approximately $1.4 million that Wendy or an entity known as Spatz Associates purportedly owed to SCI. The motion for turnover was also filed under case number 06 M1 600238.

¶ 11    Referenced in the turnover proceedings was a "Spatz Centers Inc[.] Purchase/Sale Agreement" (purchase and sale agreement) that was undated and signed by William and Wendy. According to the purchase and sale agreement, Wendy owned SCI and William "is and always has been the President and a member of the Board of Directors." The purchase and sale agreement also indicated that Wendy wanted to own SCI's 1% general partnership interest in a number of limited partnerships. Further, as of January 1, 2005, Wendy, William, and SCI agreed that: (1) Wendy agreed to transfer her interests to William "as of the date of

- 3 -

this Agreement," SCI agreed to transfer all of its interest in the general partnership interests to Wendy, and SCI would remain the general partner of the limited partnerships; (2) Wendy agreed to forgive any debt that SCI owed her and agreed to "reasonably lend, or cause to be lent to SCI, reasonable sums of money now and in the future to insure the operations of the various properties owned by Wendy," and (3) no later than March 31, 2005, William would pay or cause to be paid $310,667.60 to Wendy for her stock in SCI.

¶ 12    Following an evidentiary hearing that was held on March 20, 2009, and April 9, 2009, before Judge Alexander White in case number 06 M1 600238, the court issued an order on October 14, 2009, denying the motion for turnover. In its order, the court stated that "[t]he only relevant inquiry *** is whether Wendy is holding assets of SCI or WALP or is otherwise obligated to pay SCI or WALP for some debt." Another key question was how a certain account in SCI's general ledger, known as the "SA Distribution account," was to be interpreted. The court stated that the SA Distribution account could be an asset account that noted obligations Wendy owed to SCI, or a clearing account containing "essentially worthless entries" that served to correct otherwise erroneous entries made in the general ledger. Ultimately, the court found that the SA Distribution account was a clearing account.

¶ 13    Apparently, the dispute involved various account adjustments and reclassifications that took place in 2005. One such reclassification was for $310,667.60. The court referenced the purchase and sale agreement, wherein William was required to pay Wendy $310,667.60 for her SCI stock, and stated that plaintiff's exhibits showed that SCI made a payment or deposit to the Spatz family account in that amount in March 2005, which was payment for the purchase price of the stock. The court further stated that the payment of the purchase price had been misclassified in SCI's March general ledger, and the SA Distribution account had been used as a clearing account to properly reclassify the payment.

¶ 14    Among other items, the court addressed two entities known as the Bell Street property and an E-Trade account, both of which had been the subjects of adjustment entries. As to the Bell Street property, the court stated that the unrebutted testimony indicated that the property was owned exclusively by Wendy and her daughter. Although entries in SCI's general ledger had erroneously indicated that SCI had an interest in the property, the SA Distribution account was used as a clearing account to correctly show that the property was not an SCI asset. The court stated that the adjustment entries did not create an interest in the realty for SCI and did not transfer any interest in the realty to Wendy, as the property was never an SCI asset. Similarly, the court found that the E-Trade account had always been Wendy's exclusive property and again the SA Distribution account had been used as a clearing account to offset correcting entries made in SCI's general ledger so that the value of the E-Trade account was not shown on SCI's general ledger as an SCI asset. The court stated that the adjustment entries for the E-Trade account "neither transferred assets to Wendy nor created any obligation on her part to SCI."

¶ 15    Overall, the court found that plaintiff did not have a factual basis for seeking a turnover order against Wendy, as there was no evidence that she received anything from SCI in 2005 and "no evidence she [owed] SCI anything as a result of anything that was done in 2005." The court also noted that although plaintiff claimed that the account known as SA or Spatz Associates meant only Wendy, certain exhibits showed that this account could also mean William and the Spatz family. Accordingly, the court disagreed that funds directed to SA or Spatz Associates meant those funds were directed to Wendy.

¶ 16    The court additionally found that various November, December, and year-end entries in the SA Distribution account did not represent actual assets and adjustment entries did not reflect "any transfers of SCI's assets to Wendy of any sort" in 2005. The court explained that plaintiff had not met its burden to show that the alleged transfers for which it sought a turnover order–including the sale of SCI stock, the sale of the Bell Street property, the proceeds of certain accounts, and other transactions–"created or preserved rights for SCI which Plaintiff, as a judgment creditor, can assume and enforce against Wendy." The court further stated that Wendy "does not own anything in which SCI has an interest" and that Wendy "does not own or control any assets of *** [SCI] and/or WALP that could be made subject to a turnover order." Additionally, the court found that plaintiff failed to show that "any assets were transferred by SCI to Wendy in 2005," that "Wendy has any assets in her possession which belong to SCI," or that "Wendy owes SCI anything as a result of anything that was done in 2005."

¶ 17                    C. Fraudulent Transfer, Mere Continuation, and Alter Ego Claims

¶ 18    Plaintiff also filed a complaint in the chancery division under case number 06 CH 10267 on May 23, 2006. This chancery case was before Judge Richard J. Billik and involved three amended complaints, the third of which was filed on September 28, 2010, and ultimately proceeded to trial. Plaintiff's third amended complaint alleged that defendants violated the Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)) and asserted causes of action for mere continuation and alter ego. Previously, around March 2008, before the turnover proceedings started, plaintiff had presented a list of items that formed the basis of its fraudulent transfer claims "discovered to date." The listed transfers were: (1) at some point in or after 2005, SCI transferred all or nearly all of its partnership interests in each of 16 real estate limited partnerships to Wendy for no consideration; (2) WSM, rather than SCI, began managing and leasing for various limited partnerships and received all management and leasing revenue accordingly; (3) William paid $310,667.60 to Wendy for the transfer of SCI stock out of SCI's account rather than his personal funds; (4) SCI made distributions in the amount of $627,328 to shareholders during 2005, after the Kansas claim was brought against SCI; (5) Wendy used SCI's line of credit at South Central Bank for personal expenses and payments, including to pay off a mortgage on the Spatz's home in the amount of $564,926.98 and invest $1 million in a hedge fund; (6) SCI made over $275,000 in cash payments to Wendy in 2005; (7) SCI made a $100,000 loan to its shareholder, either William or Wendy, in 2005; (8) Wendy took management and leasing fees due to SCI in December 2005; (9) Wendy failed to provide credit support to SCI as required by the purchase and sale agreement; (10) Wendy hid debts owed to SCI and removed them from her general ledger at year end 2005; (11) SCI's books showed that Wendy owed over $1.4 million to SCI; (12) William transferred two E-Trade accounts that were carried on SCI's books to Wendy/Spatz Associates; (13) SCI made $55,000 worth of deposits into Wendy's Merrill Lynch account during 2005; (14) SCI made extraordinary payments to management at the end of 2005; and (15) SCI loans to two limited partnerships were written off SCI's books and picked up by SA's books in November 2005, but SCI received no consideration for this transfer of assets to Wendy/Spatz Associates.

¶ 19    As noted above, plaintiff's third amended complaint related to its claims under the Fraudulent Transfer Act and its mere continuation and alter ego claims. Plaintiff alleged in

part that as a result of the Kansas judgment in December 2005, William caused SCI to stop actively producing income and cease operating as the entity that managed shopping centers owned by various limited partnerships. Plaintiff asserted that William incorporated WSM on December 12, 2005, to perform the same management and leasing functions that SCI had performed, and directed that management and leasing fees previously paid to SCI be paid to WSM. Plaintiff also alleged that around March 2007, Anderson, an entity that had been a limited partnership, started managing the limited partnerships that had been managed by WSM.

¶ 20     In support of its claims under the Fraudulent Transfer Act, plaintiff listed the transfers that were allegedly made with actual intent to hinder, delay, or defraud plaintiff, including: (1) distributions paid by SCI to Wendy or William in 2005; (2) Wendy and William's conduct of purporting to delete funds owed to SCI from Spatz Associates' books; (3) Wendy and William's use of the SCI line of credit at South Central Bank to pay off a first home mortgage, transfer $1 million to Spatz Associates, "i.e., Wendy," which was later transferred to William's brother, and make miscellaneous draws for Wendy and William's benefit and offset SCI's funds for payment on the line of credit; (4) the transfer by SCI of all or the substantial part of its 1% general partnership interest in the limited partnerships; (5) the indirect transfer of management and leasing fees from SCI to the newly formed and incorporated WSM; and (6) the indirect transfer of management and leasing fees from WSM to Anderson. As part of its requested relief, plaintiff sought punitive damages, including all attorney fees incurred after the Kansas judgment, and asserted that section 8(a)(c) of the Fraudulent Transfer Act (740 ILCS 160/8(a)(c) (West 2006)) had been construed to warrant punitive damages where appropriate. In the alternative, plaintiff contended that the loan documents and Kansas judgment provided for attorney fees, and that plaintiff was entitled to all fees incurred since the Kansas judgment.

¶ 21     Next, in addition to asserting mere continuation claims against WSM and Anderson, plaintiff also alleged that William and Wendy were alter egos of SCI and WSM. In part, plaintiff contended that SCI failed to observe corporate formalities in that Wendy was never paid the $310,667.60 for her SCI stock and there were no SCI board minutes or resolutions authorizing SCI to enter into the purchase and sale agreement. Plaintiff also contended that Wendy and/or William commingled property titled in the name of Wendy and their daughter with SCI's assets, and stated that the Bell Street property was listed on SCI's balance sheets until November 2005. Plaintiff additionally alleged that SCI failed to maintain an arm's-length relationship with Wendy, William, WSM, other family members, and/or other Spatz-related entities in part because William directed the write-off of substantial obligations Spatz Associates owed to SCI and other entities in December 2005. Plaintiff sought judgment against William and Wendy in the full amount of the Illinois registered judgment, plus additional postjudgment interest and attorney fees.

¶ 22     On November 10, 2010, Wendy filed a motion to dismiss the complaint, contending that all matters against Wendy were barred by collateral estoppel. Wendy pointed to certain claims and allegations in the fraudulent transfer list and complaint that were previously adjudicated in her favor in the turnover proceedings. In response, plaintiff asserted in part that the complaint involved claims of fraudulent transfer and alter ego liability, while the turnover proceedings against Wendy only decided the narrow issue of whether Wendy owed money to SCI pursuant to entries in SCI's general ledger. However, plaintiff admitted that

two transactions involved in the turnover proceedings were subject to collateral estoppel–the transfer of E-Trade accounts from SCI to Wendy and allegedly improper payments that SCI made to Wendy through a Merrill Lynch account. In her reply, Wendy contended in part that because a husband and wife are considered to be in privity, the finding in the turnover proceedings should also apply to William.

¶ 23    On April 7, 2011, the court denied Wendy's motion to dismiss and continued the matter to "entertain further argument on the application (if any) of collateral estoppel [effect] of Judge White's *** ruling as they pertain to the complaint against Wendy Spatz."

¶ 24    On May 20, 2011, the court entered an order stating that evidence about the E-Trade or Merrill Lynch accounts, as more fully described in the fraudulent transfer list and referenced in Wendy's motion, was precluded pursuant to collateral estoppel.

¶ 25    Subsequently, prior to trial on plaintiff's complaint, SCI, WSM, Wendy, and William filed a motion *in limine* and asserted that pursuant to collateral estoppel, the ruling in the turnover proceedings precluded relitigation on certain of plaintiff's claims and factual allegations as to all defendants. Plaintiff responded in part that there was clearly no identity of parties with respect to SCI, WSM, and William and that the turnover proceeding was only filed against Wendy. Plaintiffs further contended that the turnover proceeding could not and did not address whether Wendy or any of the other defendants owed any money to plaintiff.

¶ 26    In its ruling, the court distinguished between issues pertaining to Wendy and issues pertaining to other defendants. The court denied without prejudice the motion *in limine* as to defendants other than Wendy. The court stated that at trial, upon objection, defendants would have the burden to convince the court that collateral estoppel applied to someone other than Wendy. As to issues that involved Wendy, the court stated that, upon objection, plaintiff would have the burden to show that collateral estoppel did not apply.

¶ 27    The matter proceeded to trial, which took place on a number of dates between June 28, 2011, and November 7, 2012. The bulk of the trial's relevant testimony came from William, who testified in both plaintiff's and defendants' cases. William testified that SCI, which still existed, was incorporated in 1989 with three directors, William, Wendy, and a person named Barry Herring. According to William, Herring was last affiliated with SCI in 1995, at which point there was only one director. William was the sole director and principal of SCI before January 21, 2005. William further testified that SCI's main function had been to manage properties across the country. Additionally, SCI acted as the general partner of limited partnerships that owned shopping malls and performed a variety of management functions for the limited partnerships, such as bookkeeping, filing and paying taxes, and maintaining and leasing the properties. William stated that on formation, the limited partners mostly consisted of members of his family and friends of his immediate family.

¶ 28    SCI received a certain percentage of the rental income from the tenants of the shopping malls and William acknowledged that documents shown to him by plaintiff's counsel indicated that SCI received $395,646 in management fees and $23,112 in leasing fees in 2002, about $505,698 in management fees and $37,121 in leasing fees in 2003, $568,936 in management fees and $86,332 in leasing fees in 2004, and $477,098 in management fees and $134,605 in leasing fees in 2005. According to William, however, these documents were "notoriously inaccurate." Additionally, SCI's 2005 tax return showed gross receipts or sales of $626,540. As of January 1, 2005, William and two other people were among SCI's employees.

- 7 -

¶ 29 William testified that he first became aware of the Kansas foreclosure suit sometime in the middle to end of 2004. William stated that when SCI was named as a defendant, he was not concerned at first because the loan was nonrecourse and SCI had no liability. William became concerned later, when his attorney informed him that the bank was "trying to pierce *** the non-recourse aspect of it." William received papers relating to SCI's involvement in the case sometime in March 2005. William acknowledged that SCI's answer to the bank's amended petition, filed on May 6, 2005, reflected that he had instructed his attorney to actively defend SCI. William, however, never thought that he would lose the Kansas case. William stated that the loan required that WALP had to be registered in Kansas, and one year, William did not renew or fill out the appropriate form to renew WALP's registration. Yet, according to William, if the registration lapses and then is reinstated, it is as if the registration never lapsed. Nonetheless, the Kansas court found that because the registration had lapsed, SCI had violated the terms of the loan and the loan became recourse. After the judgment was entered, William agreed to appeal, but his attorney did not mention that William would have to put up a bond not only for the judgment, but also for substantially more than the judgment, which "sort of eliminated our desire to appeal." As a result, the attorney had the appeal dismissed. William stated that the Kansas proceedings "didn't factor into anything we did" until December 1, "when we lost."

¶ 30 William acknowledged that plaintiff registered the Kansas judgment in Illinois and issued a nonwage garnishment to SCI's bank, and as a result, SCI's bank account was frozen. William also acknowledged that WSM's articles of incorporation were filed on December 12, 2005, and stated that WSM had the same address as SCI. Per a corporate resolution, William was identified as the president and secretary of WSM and Wendy was the sole member of the board of directors and received 999 of WSM's 1,000 shares, while William owned the remaining share. According to various documents, WSM was formed to do real estate management, and William testified that WSM began performing management functions for certain limited partnerships on January 1, 2006, and around February 2006, began managing a significant number of properties that SCI had previously managed. WSM received a certain percentage of the limited partnerships' rental income. William stated that no consideration or anything of value was exchanged between SCI and WSM.

¶ 31 William also further discussed how WSM came to take over management functions from SCI. In October 2005, William decided to start WSM for development occurring in Louisiana, and by December 2005, WSM was formed. However, WSM never managed any Louisiana properties "because of things that went on here." William stated that the garnishment of SCI's account made it effectively impossible to pay employees, "we needed someone to manage," and WSM "was as good an entity as any." William stated that he made the decision that it was impractical for SCI to continue as manager for various properties, with the lien on SCI's account serving as the primary factor. William also testified that the limited partnerships determined that SCI was not in a position to conduct business as needed to function on behalf of the limited partnerships. According to William, the limited partnerships "dictated who *** was going to manage and what was going to take place."

¶ 32 More specifically, William differentiated between the limited partnerships that William or SCI controlled and those that were independent. According to William, each partner, entity, or person who controlled each limited partnership decided who it wanted to manage it as of January 1, 2006. For most of the limited partnerships, SCI was the general partner or

- 8 -

managing member and had the authority "to make whatever decisions regarding management it wished to make." There, William acted as the president of the general partner as well as on behalf of the partnerships and directed the limited partnerships to pay WSM instead of SCI. William testified that he directed those limited partnerships to "behave in a certain manner, in their best interest, in which case they, you know, they did what they did." William also stated that it "[d]idn't matter to me what happened" to plaintiff, as his obligation was to act in the best interest of the limited partnerships. Of the limited partnerships that did not have SCI as a general partner and made the decision to switch to WSM independently, William stated that "those entities of which I had no control over was all done on a verbal basis." William testified that there would have been conversations and "some notification of our intent or what was going on." William further stated that "ultimately, I needed approval, but from a practical point of view, I was basically saying *** we needed to move it over" because SCI's accounts were frozen. William also stated "it was their decision whether it was allowed *** to happen." By the time these conversations took place, WSM had already been created. In total, two entities had management agreements with SCI and SCI subcontracted with WSM to manage them, eight entities had SCI as their general partner, one entity was controlled by William directly, and seven properties were neither owned nor controlled by William or Wendy and independently decided to use WSM. Additionally, one property was never managed by SCI and one entity, Anderson, managed its own property. In all, WSM managed approximately 18 properties. William testified that there were no written agreements between WSM and the limited partnerships, but there were oral agreements "in the sense that there was an understanding between the parties in terms of how they were going to function together."

¶ 33  William acknowledged that a WSM working trial balance report for 2006 listed $382,575.93 in management fees and $46,081 in leasing fees. A WSM working trial balance for 2007 listed $251,075.48 in management fees. Additionally, William stated that he took over the leasing function for SCI and directed those fees to be paid to himself or various entities other than SCI, though he believed the majority of any leasing fees earned would have been deposited into WSM's account.

¶ 34  William distinguished between SCI's and WSM's different functions. William stated that SCI never stopped doing business but hired someone else to do management. According to William, SCI's obligations were to manage the partnership as a whole, such as by doing tax returns, filing annual reports, and completing corporate resolutions as required. Additionally, as long as SCI was the general partner, it had whatever liabilities were associated with the general partner and was required to perform the functions required under the limited partnership agreements. Meanwhile, WSM was a property manager that collected rents, swept the parking lots, and paid certain bills. In early 2006, William became the only SCI employee. When WSM began operating, some of its employees were from SCI, but others were not.

¶ 35  William also testified about how SCI's finances were handled after the Kansas judgment. Because the account was frozen, and any money that had been put into SCI's account would have been taken out by plaintiff, "we bypassed that and created a general journal entry but deposited the money directly into WSM." William further stated that while SCI still had money in its account, "any money that was put in there would simply be taken out. So it was not wise to deposit money into the account." William maintained that he did not divert any

money, but "to the degree that there was any money to be deposited in this particular case, money ceased being deposited." William was presented with an SCI bank statement for July 2007 that indicated that $3,994.21 had been deposited in SCI's account. The statement had a note on it that said, " '[m]ake sure nothing gets deposited into SCI ever without my authorization.' " William explained that the note was a reaction to his being "tired of having things deposited into SCI, such as this, that clearly didn't belong there." William acknowledged that, after the Kansas judgment was entered, people at SCI were directed to make sure no money flowed through SCI's account without William's authorization. William also acknowledged that SCI's account was zeroed out by transferring $32,056.36 to WSM, which left SCI's account with $12.40 in interest. William did not recall whether he instructed that this transfer take place, but he stated that, logically, he would have been the person to do so.

¶ 36    William acknowledged that SCI's 2006 tax return reported gross receipts or sales of $1,106 and SCI's 2007 tax return showed a loss of $2,164. William estimated that the running balance in the SCI bank account since 2005 had been around $1,000. William admitted that after December 2005, SCI was not generating any business income that could have satisfied the Kansas judgment. Additionally, William testified that after the management fees were discontinued and SCI's 1% general partnership interest was transferred to Wendy through the purchase and sale agreement, SCI was left with a small general partnership interest and it "owned some odds and ends things, like furniture, nothing of great value."

¶ 37    William testified that around March 2007, Anderson began performing management functions for certain limited partnerships. Previously, Anderson had been a limited partnership that managed itself and owned a shopping center in South Carolina. William also testified that in June or July 2010, he decided to have an entity called B&A Trust provide management and leasing services to various limited partnerships.

¶ 38    William also testified about other details of SCI's and WSM's operations. William testified that the initial capital contribution to SCI was $1,000, and that it was his custom and practice to select $1,000 as a starting point for corporations because "the forms are written in a way that that's the minimum." William further stated that his business was essentially service-oriented, there were no defined capital requirements, and in theory "we always maintain enough capital to operate the business." William also stated that he would put money in and take money out of SCI. William acknowledged that tax returns for 2004 and 2005 showed additional paid-in capital of $73,027 and that a tax return for 2006 showed additional paid-in capital of $83,128. Additionally, William stated that SCI's capital was at one time at least $400,000, but would go up and down according to accounting practices. When asked whether SCI was undercapitalized in 2005 or as of the end of 2005, William responded that for a service company, there was "not much of a requirement." William also stated that the test of adequate capitalization for SCI was "were we able to function, and the answer is, yeah, we paid our bills," at least until the Kansas judgment.

¶ 39    William testified that WSM was initially capitalized with $10, but it "certainly had enough capital to operate" and its current capitalization was substantially higher. William also stated that when WSM was formed, 1,000 shares were issued for $1 per share. As of December 31, 2006, WSM's balance sheet showed assets of about $58,000 in cash. William stated that WSM currently had positive capital and still did business. Additionally, William

testified that SCI and WSM had been able to operate, pay their bills, and do their business with the capital they had in place, other than when the Kansas judgment came due.

¶ 40    William also testified about a $1.7 million line of credit for SCI that was established in March 2005 and ended in March 2006. William stated that the line of credit was set up so that if SCI overdrew its account, the money would automatically be transferred from the line of credit to SCI. Additionally, the line of credit had a sweeping function, such that William and Wendy's joint checking account, known as the SA account, was connected to the line of credit. William stated that the line of credit automatically funded any shortfalls in the SA account and took any excess funds from the SA account to pay down the line of credit. William characterized these transfers as distributions and equity contributions by William since he used the SA account as his own. William also stated that when money was taken out of the SA account, the money was effectively borrowed by SCI and lent to SA. However, William stated that "every penny" that went back to the SA account was automatically given back to SCI, effectively repaying a loan. William further stated that SA ultimately borrowed and repaid money on an ongoing basis. According to William, what plaintiff claimed was Wendy using the line of credit was actually the sweeping function at work. Moreover, William stated that "[w]e never made any personal payments out of SCI." William also stated that SCI could lend money to other people, including Wendy, at its discretion. William testified that he had no reason to talk to the bank about using the line of credit to pay the Kansas judgment because he could use the money for whatever purpose SCI deemed reasonable.

¶ 41    William testified about various other uses of the line of credit that plaintiff found suspect. One such transaction was the use of the line of credit to pay off a mortgage on Wendy's condominium. William explained that the bank required that the funds were used to clear title on the condominium because the condominium was used as collateral for the line of credit. William stated that SCI lent Wendy the money to pay off the mortgage and that SCI had the right to lend money to himself, Wendy, or anyone else.

¶ 42    William was also asked about a $1 million draw off the line of credit on March 24, 2005, which William stated was used as a loan/investment in a hedge fund that his brother controlled and whose funds belonged to William's father. William testified that this transaction was supposed to be a very short interim loan, was done to make money and was converted into "some sort of equity position." According to William, the funds were ultimately repaid with some interest. William stated that the hedge fund transaction was not documented because William tended not to document transactions with his father unless his father requested otherwise. However, William also testified that "[t]here was written evidence of the transaction and when it was supposed to be paid back and *** what the interest rate was going to be."

¶ 43    William also testified more generally about his practices around documenting transactions. William stated that he would document a transaction if he felt it was required and added that he had signed leases and notes with himself. Additionally, William stated that long-term transactions would be documented, meaning "[a]nything that wasn't being lent for the purpose of a short-term shortfall of cash flow, something of that nature." William also stated that "we have a lot of contracts with a lot of people that aren't necessarily written." As an example, William noted that "[e]very time we call up a landscaper and say I need you to

cut the grass and I'm going to pay you $500 bucks, we have a contract, but we don't document it."

¶ 44   William denied that the SCI and WSM checking accounts were used to pay for personal matters. Plaintiff's counsel presented documents from the SCI and WSM bank accounts that counsel suggested showed payments to doctors, to a recipient in Costa Rica, and for magazine subscriptions, to which William responded "[t]hey would be personal expenses." However, William testified that "we reimburse people for medical expenses as part of a semi-medical plan to help people out," the Costa Rica payments probably would have come out of a security deposit account that was maintained for a variety of entities, and the corporation admittedly received subscriptions. William further testified that his personal finances and records were run through the offices "[o]n a very superficial level," meaning that "[t]hey were not there to be accurate." Additionally, William stated that whenever possible, "we made sure that personal bills were paid out of SA and business bills were paid out of the appropriate locations." William also testified that every entity, limited partnership, and corporation had separate bank accounts, corporate filings, and annual reports. William also stated that SCI never wrote a check for a personal expense for William, Wendy, or anyone else and that any personal expenses would have been paid from the SA account.

¶ 45   William also testified that a property known as the Bell Street property ended up on SCI's books due to an accountant "who turned out to be a problem." William stated that the Bell Street property had been improperly listed as an SCI asset on SCI's books and was reclassified accordingly.

¶ 46   William also testified about invoices sent to various tenants in 2006 and 2007 that had SCI letterhead and directed payments to be made to particular limited partnerships, care of SCI. According to William, it was not unreasonable and was less confusing that SCI would continue to have bills sent. William also explained that although various invoices were sent to SCI, they were not SCI's bills, and he had tried to explain that to a vendor. William stated that the invoices were paid by WSM because the bills were the responsibility of the various limited partnerships and WSM paid them on behalf of the partnership. William stated that for years, he had tried to have the bills sent to the proper place, but he was never successful, resulting in the bills being sent to SCI.

¶ 47   Additionally, William testified about SCI's and WSM's practices around corporate formalities and records. William stated that SCI's bylaws came from a book containing various corporate documents. William recalled attending SCI director and shareholder meetings, but he stated that SCI was not required to have written meeting minutes. William also testified that he did not have documents that reflected meetings, resolutions, or actions taken because those documents were not required and often not produced. William stated that not every annual meeting was memorialized and could not recall whether a required shareholder's voting list was ever put together. William further stated that "we have waived notices" and amended bylaws from time to time to reflect the need to have meetings and the like. William also identified a series of corporate annual reports that were filed on SCI's behalf.

¶ 48   As for WSM, William testified that its bylaws were based off a standard form with some minor modifications. William agreed that WSM's first shareholders meeting took place on December 12, 2005. William further testified that because WSM's bylaws did not require an annual meeting, there would not have been a continual waiver of the annual meeting.

According to William, "[w]e'd meet *** quite frequently, all the time, shall we say?" However, the meetings did not have to be recorded unless lenders required it. William also testified that WSM had filed an annual report every year since 2006 and that annual reports were filed for every corporation and every partnership "all in good standing and continue to be in good standing." William identified corporate annual reports for WSM and WSM's articles of organization.

¶ 49  William also testified that in a situation where there is one stockholder and one director, taking notes is not required, and the bylaws do not require that meetings are documented, then "technically every time we talked to each other about the property, we had a board of directors and shareholders meeting." William maintained that "we filed all the corporate formalities in terms of what the bylaws required" and followed the requirements of the Internal Revenue Service and Illinois law.

¶ 50  William's testimony also discussed corporate resolutions. William stated that his entities produced corporate resolutions only when the bank required them. Otherwise, according to William, there was no law that required his entities to draft and adopt corporate resolutions, and further, there was no requirement for corporate resolutions to write checks and distribute money. According to William, the bylaws also did not require corporate resolutions and corporate resolutions are not done in the business world for everyday activities. William maintained that "[w]e follow the bylaws" and there was no requirement for corporate resolutions to enter into or cancel management agreements, or distribute, borrow, or lend money. William added that, "[t]he president generally has the authority to do that." As for specific transactions, William testified there was no written corporate resolution that authorized the purchase and sale agreement, as it was not required, and no corporate resolutions that authorized the $1 million loan to the hedge fund, as corporate resolutions "are not required to do things in the normal course of business." Additionally, William stated there was no resolution for the line of credit because it was not required and the bank did not require it either. William further testified that SCI made corporate resolutions "quite often," but at the insistence of lenders. William further stated that SCI would "get into corporate resolutions or meetings" if there was a change in an elected officer.

¶ 51  William also discussed SCI's relative solvency. According to William, SCI became "arguably insolvent and reasonably insolvent" around March 2006, when the line of credit was no longer available to draw against. Until then, "there was a reasonable opportunity for SCI to pay the debt, although it decided not to." William also testified that potentially until the Kansas judgment was entered, it could not be argued that SCI had more liabilities than assets.

¶ 52  William also testified about Wendy's involvement in SCI and WSM. William stated that Wendy had not been involved in the day-to-day management of SCI but had owned all of SCI's stock until December 31, 2004. William also noted that Wendy had allowed her condominium to be used as collateral for a loan for SCI, which SCI used to lend money to properties as they needed it. Further, Wendy had always owned the office locations for SCI and WSM. According to William, Wendy would have also been involved in Spatz entities where she signed loans as a guarantor or co-guarantor. For example, when WALP's lender wanted someone other than William to sign documents, William appointed Wendy vice president and she subsequently signed documents in that capacity. William further testified

that at various times, Wendy acted as vice president of design for SCI, but she was not an elected official after 2000.

¶ 53    Wendy testified about her own involvement in SCI and WSM. Wendy stated that she had no involvement in creating SCI, did not recall that she had been SCI's sole shareholder when SCI was incorporated, and did not recall serving as an officer or director of SCI. Wendy also stated that she never performed any management and leasing functions for SCI and that she did not have any involvement in SCI's day-to-day business operations. Wendy further testified that she "probably would not have paid attention" to the fact that SCI was the general partner of various limited partnerships, or if she knew that at some point, she did not remember it at trial. Additionally, Wendy did not know the amount of management fees that were paid to SCI each year and did not know how the management fees were calculated and paid by the limited partnerships. As to any agreements between SCI and the limited partnerships, Wendy testified that she "wouldn't know" and "wasn't involved with anything like that." Wendy did not recall attending any SCI annual meetings of directors or shareholders and did not believe that SCI still existed.

¶ 54    Additionally, Wendy did not recall the title of vice president being attributed to her when she signed loan documents and stated that the title was "not something I associated with myself. I wasn't active in the business." Wendy further stated, "You know, my husband *** discussed various things with me. As I'm about to sign something, I ask questions. You know, if I'm comfortable with it, I sign it." Wendy noted that she had signed "a variety of things and it's been over many years," and that she "[asks] the questions at the time, *** Bill and I discuss it." Wendy also testified that "when I'm going to sign something, I'm given a sort of perfunctory explanation. You can tell from my involvement that this isn't my area of expertise." Wendy stated that she trusted that William was running the business "and he runs it well." However, Wendy also stated that she "felt some ownership" in SCI.

¶ 55    Wendy also testified that she did not assist William or otherwise take the lead in creating the documents necessary to form WSM. Wendy did not recall why WSM was created or when it was formed. Wendy also did not recall being elected as WSM's sole director and stated that William ran WSM on a day-to-day basis. Wendy assumed that WSM was managing properties, but she did not "know any specifics around it." Wendy did not remember attending any WSM shareholder or board meetings after December 2005.

¶ 56    Elisheva Kalutsky, who was an accountant and had prepared SCI's tax returns, also testified. She agreed that there were periods of time when an E-Trade account was shown as being owned by SCI and acknowledged that as of the 2005 tax return, the E-Trade account that was previously carried on SCI's books was put on Wendy's individual tax return. Kalutsky was also familiar with the Bell Street property, which was owned by Wendy and her daughter. The property's revenue, expenses, and business operations were carried through SCI, which went to Wendy and Bill's tax return.

¶ 57    James Rudnicki, a business turnaround consultant, testified for plaintiff about the transfer of management and leasing contracts to WSM, commingling, and SCI's relative solvency. According to Rudnicki, SCI did not receive any reasonably equivalent value or consideration for transferring the management and leasing contracts to WSM. Rudnicki also testified that he saw evidence of commingling between SCI's and William and Wendy's assets, including $1 million that was distributed to Wendy and then paid to an entity controlled by William's brother and the use of the line of credit to pay off a mortgage on a condominium owned by

Wendy. However, Rudnicki admitted that he did not know why the line of credit was opened or why the line of credit was used to pay off the mortgage on the condominium. Rudnicki also stated that there were "constant payments" to third parties that appeared to have little, if anything, to do with managing a real estate entity. Rudnicki also testified that SCI could lend money to William or Wendy.

¶ 58 Rudnicki further stated that SCI was insolvent throughout 2005. According to Rudnicki, at any point during that year, the liabilities exceeded the assets because the liability for the Kansas judgment had existed since the beginning of 2005 and on every date that year it was probable that the Kansas lawsuit would be a liability. Rudnicki further stated that when the Kansas judgment and line of credit were taken into account, SCI's liabilities were considerably in excess of its assets in 2005. However, Rudnicki admitted that he did not perform a precise valuation of SCI's assets and liabilities. Rudnicki testified that once it became clear that the value of SCI's assets was less than the $1.4 million judgment, there was no reason to perform a more precise calculation. Additionally, Rudnicki stated that according to SCI's 2005 tax return, SCI only had $100,000 in capital and a $100,000 shareholder loan, leaving the company with no capital at that point.

¶ 59 After plaintiff presented its case, defendants moved for a directed finding pursuant to section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2012)), contending that plaintiff failed to establish a *prima facie* case for its claims. The court issued an oral ruling on October 15, 2012, and a written order on October 23, 2012. In part, the court found that plaintiff made a sufficient showing of its alter ego claims against William, but did not make a *prima facie* case that Wendy was an alter ego of SCI or WSM. The court recounted plaintiff's and defendants' arguments and noted that defendants "maintain that none of the alter ego factors that have been discussed in the cases were proven as to Wendy in such a way as to provide a solid foundation for piercing the corporate veil against her." The court stated that "[b]ased on the showing that is made thus far, *** there has not been a unity of interest in ownership, that the separate personalities of the corporation in the individual Wendy no longer existed during the relevant period." The court further stated that "[b]ased on the record it has been shown that it was William who operated SCI and WSM."

¶ 60 As part of their case, defendants called Ralph Picker, an accountant and managing principal of a certified public accounting firm. Picker testified that he did not see anything unusual in SCI's business and accounting practices, though he did see a lot of mistakes. For example, Picker saw property and accounts on the books that were not in the corporate name. Picker also stated that correction entries were made for assets that were not assets of the corporation and adjustments were made for liabilities that were not company liabilities. According to Picker, it was very common to see smaller S corporations remove assets and liabilities that should not be on their books and for entities to have unsophisticated accounting records. From his review, Picker also did not see SCI or WSM commingling funds, which Picker defined as mixing funds that do not belong to a particular entity. Additionally, Picker stated that for a line of credit, a lender would generally require a payoff of an existing mortgage. Picker further stated that it was not improper for a business entity to make a loan to an unrelated third party.

¶ 61 Picker also testified that SCI's tax return showed that it was solvent, as there was an excess of assets over liabilities. According to Picker, there was no indication in 2005 that SCI's liabilities exceeded its assets and further, there were positive retained earnings and no

deficit. Picker also stated that, among other considerations, the question of solvency must be based on a fair valuation, which plaintiff's expert, Rudnicki, did not perform. However, Picker acknowledged that he also did not perform any valuations in terms of certified valuations. Additionally, as to capitalization, Picker stated that a company does not need a certain minimum amount of capital unless it has significant loan payments to make, significant investments in capital equipment, or significant recurring obligations, but "in this case you didn't have that."

¶ 62    The court issued an oral ruling on November 19, 2012, and a written judgment on November 28, 2012. Overall, the court found that two transfers violated the Fraudulent Transfer Act: the transfer of assets under the purchase and sale agreement and, through William, SCI's arranging for the transfer of management fees, income, and compensation from the limited partnerships to WSM and Anderson, both of which were done to hinder, delay, or defraud plaintiff from pursuing the Kansas judgment. As to the latter transfer, the court stated in its ruling that the transfers occurred for no or inadequate consideration and were made to insiders for purposes of the Fraudulent Transfer Act. The court found that WSM was created in December 2005 "for purposes of arranging for fees, compensation and income that would have been received by SCI to be transferred to WSM." According to the court, there was an inference that William was aware of the Kansas litigation at least toward the end of 2004 and that William became concerned about SCI being a party after SCI was named in the suit. Additionally, the court found that there was no credible inference presented for why SCI could not have continued to manage the limited partnerships' properties after December 2005, "except for the considerations testified about arising from the Kansas judgment and the post-judgment collection efforts by [p]laintiff." The court stated that William, as the principal and person in control of SCI, decided on behalf of SCI and the limited partnerships to arrange for fees, compensation, and income to be diverted from SCI to WSM and arranged for SCI to refrain from doing business because of the garnishment and postjudgment supplemental proceedings that plaintiff initiated, which arose out of the Kansas judgment.

¶ 63    Moreover, the court found that William, who controlled SCI, remained in control of the assets transferred to WSM and Anderson and controlled those entities as well. Indeed, the court stated that William was "really the only principal in all those three concerns." Additionally, the court stated that Wendy and even William at various times "held not insignificant interests" in the limited partnerships that SCI managed or for which it served as general partner. According to the court, the transfers allowed WSM and Anderson to receive management fees, compensation, and other income that would have otherwise gone to SCI, and further, William and Wendy were "owners, officers and/or controlling persons of WSM and Anderson." At the same time, the court noted that, per her testimony, Wendy had not been involved in any way with the management or operation of SCI, WSM, and Anderson, and that her testimony conveyed the impression that she deferred to William entirely to manage, operate, and run the three entities.

¶ 64    The court further stated that the transfers of the management fees, compensation, and income, and the right to receive those funds from the limited partnerships, involved all or substantially all of SCI's assets and at least a major portion of its business before 2006. The court also stated that by arranging for the transfers of the right to receive management fees, compensation, and income, SCI through William caused SCI to become insolvent because of

the transfers or shortly after the transfers occurred. Additionally, the court took issue with William characterizing WSM and Anderson as entities that SCI simply hired on behalf of the limited partnerships because WSM and Anderson were not contractors, but entities that William controlled.

¶ 65     As to the alter ego claims against William, the court found that while there was some evidence that would support piercing SCI's corporate veil, "the fact of the matter is this Court has reviewed all of the evidence" and was not convinced that plaintiff proved its alter ego claim against William. The court stated that SCI had been in business for "not an insignificant period of time," had assets, and maintained a separate identity. The court acknowledged its findings that SCI was controlled by William and that William arranged for a significant part of its assets to be parted with and transferred to WSM and later Anderson, both of which William also controlled. Nonetheless, the court did not believe that plaintiff had proven that William was an alter ego of SCI or WSM. Additionally, the court found that WSM was a mere continuation of SCI, stating in its written judgment that "all liabilities, debts, and obligations of SCI, including but not limited to liability for the fraudulent transfers determined herein, the Kansas Judgment, and pre and post-judgment interest accruing on the Kansas Judgment, are the direct liabilities of WSM." The court denied plaintiff's mere continuation claim against Anderson.

¶ 66     In its written judgment, the court voided the following transfers: (1) the transfers of SCI's general partnership interests from SCI to Wendy in certain limited partnerships; and (2) the transfer of management and leasing duties/fees from SCI to WSM around December 2005 or early 2006, and thereafter, Anderson in 2006 and B&A Trust in 2010. The court also entered money judgments against WSM and Anderson in the amount of $885,720.66 and $1,021,059.47, respectively, representing the amount of management and leasing fees received by each entity. The court permitted plaintiff leave to file a petition for attorney fees, costs, and prejudgment interest.

¶ 67     Subsequently, plaintiff apparently filed a fee petition, which was not found in the record despite a careful search. Nonetheless, it appears a fee petition was filed because a motion by defendants references a 15-page fee petition. However, the record does contain an appendix of exhibits for plaintiff's fee petition, which spans over 400 pages and includes affidavits from various attorneys who worked on this matter, as well as tables that show corresponding billing entries. Some of the entries have been partially redacted.

¶ 68     In their response to the fee petition, defendants contended in part that there was no statutory authority for fee awards under the Fraudulent Transfer Act and that the claim for mere continuation also did not authorize a fee award. Additionally, defendants asserted that there was no written contract providing for fees between plaintiff and WSM or Anderson. Defendants also stated that the court could consider reducing the amount sought because plaintiff was not successful on all of its claims. Further, defendants contended that plaintiff's appendix revealed numerous improper charges. Defendants asserted that the court should examine certain requested costs "in the context of an evidentiary hearing to ascertain whether these fees are reasonable."

¶ 69     A subsequent order indicated that a hearing on the fee petition was scheduled for June 25, 2013. On that date, the court entered an order that stated:

     "This matter coming before the Court on Plaintiff's petition for attorney's fees, costs, and prejudgment interest, the Court having heard arguments from the parties,

- 17 -

the petition is granted and the matter is continued for formal entry of an order with respect to the specific amounts \*\*\*. The Court notes Defendants WSM and Anderson Associates objections."

¶ 70    On July 10, 2013, the court entered a second order related to fees, stating that the court had considered the arguments of the parties on June 25, 2013, and had granted plaintiff's petition "in its entirety in open Court on that day." The court then awarded attorney fees, costs, and prejudgment interest in favor of plaintiff and against SCI, WSM, and Anderson jointly and severally. The court awarded a total of $2,242,507.28 to plaintiff, which consisted of $1,125,238.60 in attorney fees, $158,020.49 in costs, and $959,248.19 in prejudgment interest. The record does not contain a report of proceedings for June 25, 2013, or July 10, 2013. We note that it is the appellant's burden to present a sufficiently complete record of proceedings at trial to support a claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 71                                    II. ANALYSIS
¶ 72                            A. Parties' Statements of Facts
¶ 73    On appeal, we first consider defendants' contention that plaintiff's statement of facts contains improper argument and should be stricken. In response, plaintiff withdraws any statements that we view as argumentative and asserts that defendants' statement of facts also contains argumentative comments, as well as *ad hominem* attacks against plaintiff's counsel and antagonistic comments toward the trial court judges. Neither party specifically identifies the statements each finds improper. Nonetheless, in our view, both parties' statements of facts contain statements that could be considered argumentative. See Ill. S. Ct. R. 341(h)(6) (eff. Feb. 6, 2013) (briefs should contain a statement of facts, "which shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment"). However, we decline to strike either party's statement of facts and instead disregard any offending portions. See *Hamilton v. Conley*, 356 Ill. App. 3d 1048, 1052-53 (2005). We also admonish both counsel to be mindful in the future of the requirement to avoid argument in the statement of facts. See *Friends of the Parks v. Chicago Park District*, 203 Ill. 2d 312, 319 (2003).

¶ 74                                B. Collateral Estoppel
¶ 75    We next consider defendants' contention on cross-appeal that the court improperly applied collateral estoppel because the turnover proceeding against Wendy controlled much of the case related to plaintiff's fraudulent transfer and alter ego claims. Defendants argue that in both cases, the singular point of plaintiff's claims was the source and availability of money and assets to satisfy the Kansas judgment. Defendants assert that the turnover proceedings fully examined the Kansas litigation, the use of SCI's credit line, SCI's income, assets, and financial activity in 2005, the existence, creation, and point of the SCI purchase and sale agreement, and the purported depletion of SCI assets through reclass and accounting adjustments in 2005, among other issues. Defendants further argue that there were significant overlaps among the allegations in plaintiff's complaint, plaintiff's 2008 fraudulent transfer list, and the order denying the motion for turnover. Defendants also assert that the court's order in the turnover proceeding was a final order disposing of the proceedings against

Wendy and that the parties were identical in that William and Wendy litigated against plaintiff in both matters.

¶ 76 Collateral estoppel was raised twice before trial: in Wendy's motion to dismiss and in the subsequent motion *in limine* as to SCI, WSM, William, and Wendy. When properly applied, collateral estoppel promotes fairness and judicial economy by preventing the relitigation of issues that have already been resolved in earlier actions. *Du Page Forklift Service, Inc. v. Material Handling Services, Inc.*, 195 Ill. 2d 71, 77 (2001). Collateral estoppel "applies when[:] [(1)] the issue decided in the prior adjudication is identical with the one presented in the current action, [(2)] there was a final judgment on the merits in the prior adjudication, and [(3)] the party against whom estoppel is asserted was a party to, or in privity with a party to, the prior adjudication." (Internal quotation marks omitted.) *United Automobile Insurance Co. v. Buckley*, 2011 IL App (1st) 103666, ¶ 39. Collateral estoppel applies to determinations of law as well as fact. *Du Page Forklift Service, Inc.*, 195 Ill. 2d at 79. Moreover, the party claiming collateral estoppel has the burden of establishing it by clear, concise, and unequivocal evidence. *Pedersen v. Village of Hoffman Estates*, 2014 IL App (1st) 123402, ¶ 42. Whether the doctrine of collateral estoppel applies to a particular case is a question of law that this court reviews *de novo*. *Id*. Further, although normally we review a trial court's decision on a motion *in limine* for an abuse of discretion, where, as here, the issue involves a question of law, the standard of review is *de novo*. *Schandelmeier-Bartels v. Chicago Park District*, 2015 IL App (1st) 133356, ¶ 25.

¶ 77 Here, the primary question is whether the issues decided in the turnover proceeding against Wendy were identical with plaintiff's fraudulent transfer and alter ego claims. In the turnover proceeding, plaintiff sought to force Wendy to pay certain debts she or Spatz Associates purportedly owed to SCI that could then be used to satisfy the outstanding Kansas judgment. The court noted there were two central questions: whether a certain account, identified as the SA Distribution account, was an asset or clearing account, and whether Wendy was holding assets of SCI or WALP or was otherwise obligated to pay SCI or WALP for a debt. The court determined that the SA Distribution account was a clearing account and that various adjustments and transfers did not create an asset for SCI or obligations of Wendy to SCI. The court further found that Wendy did not own anything in which SCI had an interest, Wendy did not own or control any SCI or WALP assets that could be subject to a turnover order, and plaintiff failed to show that any assets were transferred by SCI to Wendy in 2005.

¶ 78 Meanwhile, in its complaint, plaintiff listed six transfers that were allegedly at issue, including distributions paid by SCI to William or Wendy in 2005, William and Wendy's conduct of deleting money owed to SCI from Spatz Associates' books, the use of SCI's line of credit to pay off William and Wendy's mortgage, and the transfer of management and leasing fees from SCI to WSM. Plaintiff also alleged in its complaint that Wendy was never paid $310,667.60 for her SCI stock and that William directed the write-off of the books of Spatz Associates of substantial obligations Spatz Associates owed to SCI and other entities in December 2005. Plaintiff's fraudulent transfer list, which was created in 2008 before the turnover proceedings, listed 15 allegedly fraudulent transfers, including the transfer of SCI's partnership interests in various limited partnerships to Wendy for no consideration, cash payments to Wendy in 2005, an allegation that Wendy hid debts owed to SCI and removed

them from her general ledger, and that SCI's books showed that Wendy owed over $1.4 million to SCI.

¶ 79    To be sure, there are superficial overlaps between some facts and issues decided in the turnover proceedings and the allegedly fraudulent transfers at issue at trial. However, the facts and issues decided in the turnover proceedings were different than those presented at trial. In the turnover order, the transfers were discussed in the narrow context of whether they showed that Wendy owed money to SCI or WALP. In contrast, a primary consideration under the Fraudulent Transfer Act is whether a debtor made a transfer with "actual intent to hinder, delay, or defraud" a creditor. 740 ILCS 160/5(a)(1) (West 2006). A claim under the Fraudulent Transfer Act considers not just whether the transfer occurred, but whether the circumstances show that the transfer was done to avoid a creditor. Numerous considerations are involved, such as whether the transfer or obligation was to an insider, when the transfer was made, whether the transfer was of substantially all of the debtor's assets, and whether the debtor became insolvent shortly before or after a substantial debt was incurred, among others. 740 ILCS 160/5(b) (West 2006). Meanwhile, the turnover order was only concerned with the result of the transfers at issue–whether Wendy had assets that belonged to SCI or WALP. Further, a claim that seeks to pierce the corporate veil based on an alter ego theory examines whether a person or entity "uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 527 (2002). This inquiry considers numerous operating practices and the relative involvement of the allegedly dominant individuals–here, William and Wendy. See *Fiumetto v. Garrett Enterprises, Inc.*, 321 Ill. App. 3d 946, 958-59 (2001) (factors at issue include inadequate capitalization, failure to issue stock, failure to observe corporate formalities, insolvency of the debtor corporation, nonfunctioning of officers or directors, and the absence of corporate records, among others). Again, the turnover proceeding only answered the question of whether Wendy owed SCI or WALP money. In this vein, in addition to correctly denying Wendy's motion to dismiss, the court also properly denied the motion *in limine* that sought to bar certain testimony and evidence as to multiple defendants, as the turnover order focused on Wendy and did not conclusively decide anything with regard to other defendants.

¶ 80    Moreover, application of collateral estoppel must be narrowly tailored to fit the precise facts and issues that were clearly determined in the prior judgment. *Nowak v. St. Rita High School*, 197 Ill. 2d 381, 390-91 (2001). "[I]t is absolutely necessary that there [was] a finding of a specific fact in the former judgment or record that is material and controlling in that case and also material and controlling in the pending case." (Internal quotation marks omitted.) *Kessinger v. Grefco, Inc.*, 173 Ill. 2d 447, 462 (1996). The court's discussion in the turnover proceeding of the mechanics of various transfers and how they affected Wendy's obligations are not truly material and controlling in the current case, where the issues are much broader than whether transfers show that Wendy owed money to SCI and WALP.

¶ 81    Nonetheless, to the degree that the court was unsure about whether collateral estoppel should apply, it acted prudently. Where "there is any uncertainty on the point that more than one distinct issue of fact is presented to the court, [collateral] estoppel will not be applied." (Internal quotation marks omitted.) *Id*. The court, perhaps uncertain whether certain facts and issues were truly identical, selected a proper course of action that allowed objections at trial based on collateral estoppel and shifted the burden depending on which defendant was at issue. Overall, we find that the court correctly denied the application of collateral estoppel

- 20 -

before trial.

¶ 82                                    C. Fraudulent Transfer Act

¶ 83     We next consider defendants' contention that the court erred in finding that defendants violated the Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)). Defendants argue that the limited partnerships had previously hired SCI to manage the properties and were under no obligation to work with SCI for any reason. Defendants further contend that no transfer occurred because the limited partnerships merely delegated management to another entity that could handle the responsibilities, which was their right to do. Moreover, according to defendants, William did not have any reason in 2005 to believe that SCI would be liable in the Kansas litigation and all decisions were made in the normal course of business. Defendants also assert that William acted in good faith and note William's testimony that he was obligated on behalf of the limited partnerships to find management that could perform. Additionally, defendants argue that plaintiff never proved there was a "lack of reasonably equivalent value" under the Fraudulent Transfer Act because neither expert actually valued the management agreements and SCI's assets.

¶ 84     The standard of review of a trial court's judgment after a bench trial is whether that judgment is against the manifest weight of the evidence. *Northwestern Memorial Hospital v. Sharif*, 2014 IL App (1st) 133008, ¶ 25. "A finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *Munson v. Rinke*, 395 Ill. App. 3d 789, 795 (2009). "In a bench trial, it is the function of the trial judge to weigh the evidence and make findings of fact" and we may "not substitute [our] judgment for that of the trier of fact." (Internal quotation marks omitted.) *Falcon v. Thomas*, 258 Ill. App. 3d 900, 909 (1994). Further, we will not disturb a trial court's judgment as long as there is evidence to support it. *Sharif*, 2014 IL App (1st) 133008, ¶ 25. We also note that "[w]e may affirm the judgment of the trial court on any basis in the record, regardless of whether the trial court relied upon that basis or whether the trial court's reasoning was correct." (Internal quotation marks omitted.) *Id.*

¶ 85     "The purpose of the [Fraudulent Transfer] Act is to invalidate otherwise sanctioned transactions made with a fraudulent intent." (Internal quotation marks omitted.) *Id.* ¶ 16. The test to determine the validity of a transfer is "whether or not it directly tended to or did impair the rights of creditors." (Internal quotation marks omitted.) *Apollo Real Estate Investment Fund, IV, L.P. v. Gelber*, 403 Ill. App. 3d 179, 193 (2010).

¶ 86     Under the Fraudulent Transfer Act, a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer:

　　　　"(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

　　　　(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

　　　　(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." 740 ILCS 160/5 (West 2006).

¶ 87 Two causes of action for fraud are permitted under the Fraudulent Transfer Act: "fraud in law" and "fraud in fact." *Apollo Real Estate Investment Fund, IV, L.P.*, 403 Ill. App. 3d at 193. Under a "fraud in law" transfer, which is set forth in section 5(a)(2) of the Fraudulent Transfer Act (740 ILCS 160/5(a)(2) (West 2006)), the "transfer is made for no or inadequate consideration, [and] the fraud is presumed." (Internal quotation marks omitted.) *Sharif*, 2014 IL App (1st) 133008, ¶ 18. Under a "fraud in fact" transfer, which is a cause of action under section 5(a)(1) of the Fraudulent Transfer Act, a party must prove that the transfer was made with actual intent to hinder, delay, or defraud the creditors. *Apollo Real Estate Investment Fund, IV, L.P.*, 403 Ill. App. 3d at 193. Defendants seem to suggest that plaintiff needed to prove both types, which is incorrect. We find that a conclusion that defendants violated the Fraudulent Transfer Act under a "fraud in fact" analysis was not against the manifest weight of the evidence.

¶ 88 A creditor can prove "fraud in fact," or actual fraud, based on the existence of certain factors or "badges of fraud." 740 ILCS 160/5(b) (West 2006); *Steel Co. v. Morgan Marshall Industries, Inc.*, 278 Ill. App. 3d 241, 251 (1996). Section 5(b) provides that "consideration may be given, among other factors, to whether:

"(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor." 740 ILCS 160/5(b) (West 2006).

¶ 89 These factors are merely considerations (*Steel Co.*, 278 Ill. App. 3d at 251) and a court need not consider all 11 factors (*Sharif*, 2014 IL App (1st) 133008, ¶ 23). When the factors are present in sufficient number, "it may give rise to an inference or presumption of fraud." *Steel Co.*, 278 Ill. App. 3d at 251. At the same time, "the symptoms are not additive" and it is possible that the presence of only one factor could entitle a party to relief. *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005).

Additionally, the debtor and donee of the transfer have the burden of dispelling an implication of fraud. *Sharif*, 2014 IL App (1st) 133008, ¶ 31.

¶ 90    Defendants only challenge the trial court's finding that the transfer of management fees, income, and compensation from SCI to WSM violated the Fraudulent Transfer Act. We first address defendants' contention that no transfer occurred because the limited partnerships merely delegated management to another entity and there was no testimony that "the right to do a job" is an asset. We disagree. By arranging for WSM to receive an income stream, SCI transferred an asset. Under the Fraudulent Transfer Act, an "asset" is generally defined as the property of the debtor. 740 ILCS 160/2(b) (West 2006). "Transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." 740 ILCS 160/2(l) (West 2006). SCI generated significant management and leasing fees before 2006 and received a certain percentage of the rental income from shopping malls. Notwithstanding William's testimony that a set of limited partnerships independently decided to use WSM, there was ample evidence that, to the contrary, SCI through William directed nearly all of the limited partnerships at issue to work with WSM instead of SCI. William testified that for most of the limited partnerships, SCI–of which William was the principal–was the general partner or managing member and directed the limited partnerships to "behave in a certain manner, in their best interest." William also testified that as to the so-called independent limited partnerships, there were conversations and "some notification of our intent or what was going on," and despite needing approval, "I was saying *** we needed to move it over" because SCI's accounts were frozen. William's testimony strongly suggested that he directed the limited partnerships, whether independent or not, to use WSM instead of SCI. After SCI arranged for WSM to receive the management fees, WSM received over $382,000 in management fees in 2006 and over $250,000 in management fees in 2007. Sources of income have been found to be assets. See *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1412 (7th Cir. 1989) (vehicle leases had value in light of object of transaction, which was to sell to the purchaser what it needed to undertake transportation responsibilities previously performed by the seller); *Blaguss Travel International v. Musical Heritage International*, 833 F. Supp. 708, 712-13 (N.D. Ill. 1993) (whether executory contract was an "asset" with "value" was a question of fact where "it is not difficult to imagine executory contracts that could provide the debtor with a steady cash flow with limited expenditure of effort and resources"). Through William, SCI "part[ed] with an asset" (740 ILCS 160/2(l) (West 2006)) by directing that management fees it previously received be paid to WSM.

¶ 91    Turning to the factors in section 5(b) of the Fraudulent Transfer Act, the evidence showed that the transfer of the management agreements from SCI to WSM was made to an insider. In addition to being the principal of SCI, William was the president and secretary of WSM and effectively controlled WSM. See 740 ILCS 160/2(g)(2)(C) (West 2006) (insiders of a debtor corporation include a person in control of the debtor). As the trial court found, William remained in control of the management fees and income in the new arrangement with WSM.

¶ 92    Additionally, before WSM began receiving the management fees, SCI had been sued in the Kansas foreclosure case. SCI was named as a defendant in the Kansas litigation on

- 23 -

February 22, 2005, a ruling against SCI was made on December 1, 2005, and the final order was entered on December 30, 2005. William testified that WSM began managing properties for certain limited partnerships on January 1, 2006, and a significant number of SCI's former properties around February 2006. On a related note, this evidence also shows that the transfer of the management fees to WSM occurred shortly after a substantial debt was incurred–namely, the approximately $1.4 million judgment entered in the Kansas litigation.

¶ 93    In addition, the transfer of the management fees constituted substantially all of SCI's assets. Whereas SCI's 2005 tax return showed gross receipts or sales of $626,540, its 2006 tax return, which would have been completed after WSM started managing the properties, reported gross receipts or sales of $1,106, and its 2007 tax return showed a loss of $2,164. Further, William acknowledged that a transfer of $32,056.36 out of SCI's account, which went to WSM, left SCI with a zero balance other than $12.40 in interest. William also admitted that after December 2005, SCI did not generate any business income that could have satisfied the Kansas judgment and estimated that the balance in SCI's account since 2005 had been around $1,000. Based on the evidence presented, the arrangement with WSM left SCI with very little assets.

¶ 94    Additionally, we note William's testimony about the impact of the Kansas judgment and its consequences on his decision to steer management fees to WSM. William testified that the Kansas proceedings did not factor into SCI's actions until December 1, 2005, "when we lost." William also admitted that the garnishment of SCI's account–a result of the Kansas judgment–was a primary reason for bringing in new management. William also stated that while SCI's bank account had money in it, it was not wise to deposit money into that account and that "money ceased being deposited" into SCI's account. There was also evidence that William directed that no money should be deposited into SCI's account without his authorization. William's testimony strongly suggests that the transfer of the management income to WSM was a calculated move to escape the Kansas judgment, which had manifested in the form of a garnishment on SCI's account. Though William provided some innocent explanations for the arrangement with WSM, we also note there was evidence that he acted to hinder plaintiff's ability to collect its judgment, and we will not substitute our judgment for that of the trier of fact on matters of the credibility of a witness, the weight of the evidence, and the inferences drawn from the evidence unless the opposite conclusion is evident from the record. *Sharif*, 2014 IL App (1st) 133008, ¶ 26. Here, the conclusion that the transfer of management fees to WSM was fraudulent was not against the manifest weight of the evidence.

¶ 95                              D. Wendy as Alter Ego of SCI and WSM

¶ 96    Next, we address plaintiff's contention that it presented sufficient evidence to support its claims that Wendy was an alter ego of SCI and WSM, such that these claims should have at least survived defendants' motion for a directed finding. Plaintiff asserts that Wendy used SCI's line of credit for personal expenses and payments, failed to act in her capacity as officer and sole shareholder of SCI and as sole director and 99% shareholder of WSM, and allowed her E-Trade account and the Bell Street property to be carried on the books and records of SCI, but then claimed these as her own assets at trial.

¶ 97    In a bench trial, section 2-1110 of the Code of Civil Procedure (735 ILCS 5/2-1110 (West 2012)) allows a defendant, at the close of the plaintiff's case, to move for a finding or

judgment in his favor. In ruling on this motion, a court engages in a two-step analysis. *527 S. Clinton, LLC v. Westloop Equities, LLC*, 403 Ill. App. 3d 42, 52 (2010). First, the court must determine as a matter of law whether the plaintiff has presented a *prima facie* case, meaning the court must ask whether the plaintiff presented some evidence on every element essential to the cause of action. *Id*. Second, if the plaintiff presented some evidence on each element, the court must then consider and weigh the totality of the evidence presented, including evidence favorable to the defendant, to determine whether the *prima facie* case survives. *Hatchett v. W2X, Inc.*, 2013 IL App (1st) 121758, ¶ 35. If the trial court finds that the plaintiff has failed to present a *prima facie* case as a matter of law, the appellate standard of review is *de novo*. *Minch v. George*, 395 Ill. App. 3d 390, 398 (2009). However, if the trial court moves on to consider the weight and quality of the evidence and finds that no *prima facie* case remains, the appellate standard of review is the "manifest weight of the evidence" standard. *Id*.

¶ 98    Here, we review whether the court's finding at the directed finding stage was against the manifest weight of the evidence because the court engaged in the second part of the analysis. In its ruling, the court recounted each side's position and noted the specific evidence that each side had presented, including defendants' evidence. For example, the court noted that defendants "maintain that none of the alter ego factors that have been discussed were proven as to Wendy in such a way as to provide a solid foundation for piercing the corporate veil against her," and the court stated that, based on the record, William operated SCI and WSM. Accordingly, the court considered the weight and quality of the evidence and we will determine whether the court's ruling was against the manifest weight of the evidence.

¶ 99    A corporation is a legal entity that exists separate and apart from its shareholders, directors, and officers, who are not as a general rule liable for the corporation's debts and obligations. *Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 794 (1993). One of the primary purposes of doing business as a corporation is to insulate stockholders from unlimited liability for corporate activity. *Peetoom v. Swanson*, 334 Ill. App. 3d 523, 526 (2002). However, in certain situations a court will find shareholders, directors, or officers personally responsible for corporate obligations through a remedy known as piercing the corporate veil. *Ted Harrison Oil Co.*, 247 Ill. App. 3d at 795. A corporate entity will be disregarded where it would otherwise present an obstacle to the protection of private rights or where the corporation is merely the alter ego or business conduit of the governing or dominant personality. *Id*. To pierce the corporate veil, a plaintiff must demonstrate that: (1) there is such unity of interest and ownership that the separate personalities of the corporation and individual no longer exist, and (2) the circumstances are such that adhering to the fiction of a separate corporate existence would promote injustice or inequitable consequences. *Fiumetto*, 321 Ill. App. 3d at 958.

¶ 100   In determining whether the first prong is met, a court generally will not rest its decision on a single factor, but will examine many factors, including: (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether the corporation is a mere façade for the operation of the dominant stockholders.

*Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 503 (2005). At trial, the party seeking to have the corporate entity disregarded must come forward with a substantial showing that the corporation is really a dummy or sham for a dominating personality. *Ted Harrison Oil Co.*, 247 Ill. App. 3d at 796.

¶ 101   We agree with the trial court that plaintiff failed to establish that Wendy was an alter ego for SCI or WSM. Wendy's involvement in SCI and WSM was marginal at best. Wendy's testimony suggested she knew very little about SCI and WSM and was barely involved in either entity. According to William, although Wendy owned the location where SCI and WSM had their offices, served as vice president of design at one point, and signed loan documents, Wendy was not involved in the day-to-day management of SCI or WSM. She recalled that she felt some ownership of SCI, but stated that her title of vice president was not something she associated with herself and did not recall one of SCI's main functions, which was to act as a general partner for various limited partnerships. Additionally, Wendy did not know the amount of management fees SCI received and did not know about any agreements between SCI and the limited partnerships. Wendy trusted that William was running the business and though she asked questions of William when asked to sign something, she also stated she was given perfunctory explanations of what she was signing. Wendy testified similarly about her lack of involvement in WSM. She stated that she did not know when WSM was formed or why WSM was created. She also did not remember being elected as WSM's sole director. Based on the evidence presented, William was in charge of SCI and WSM and Wendy played an extremely limited role. Overall, Wendy was far from being the governing or dominant personality associated with individuals who are alter egos for corporations. See *id.* at 795. Plaintiff's case-in-chief failed to establish that SCI or WSM was a sham for Wendy such that the separate personalities of Wendy, SCI, and WSM failed to exist. As such, the court properly dismissed the alter ego claims against Wendy at the directed finding stage.

¶ 102                    E. William as Alter Ego of SCI and WSM

¶ 103   We next consider plaintiff's contention that William was an alter ego of SCI and WSM. Plaintiff argues that both entities were inadequately capitalized, failed to observe corporate formalities, lacked corporate records, commingled funds and failed to maintain arm's-length relationships, were insolvent, diverted assets to the detriment of a creditor, had nonfunctioning officers and directors, and were mere façades for William to shield himself from personal liability.

¶ 104   We will not reverse a finding of the trial court about piercing the corporate veil unless it is against the manifest weight of the evidence. *Jacobson v. Buffalo Rock Shooters Supply, Inc.*, 278 Ill. App. 3d 1084, 1088 (1996). Further, as noted above, "[a] finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *Munson*, 395 Ill. App. 3d at 795. Further, piercing the corporate veil is a task that courts should undertake reluctantly. *Ted Harrison Oil Co.*, 247 Ill. App. 3d at 795.

¶ 105   We address each of the alter ego factors that plaintiff raises: inadequate capitalization, failure to observe corporate formalities, absence of corporate records, commingling of funds and failure to maintain arm's-length relationships, insolvency of the debtor corporation,

diversion of assets from the corporation to the detriment of creditors, nonfunctioning of other corporate officers or directors, and the corporation is a mere façade for the operation of the dominant stockholders. As we detail below, based on our analysis of the first prong of the alter ego analysis, the trial court's finding that William was not an alter ego of SCI or WSM was not against the manifest weight of the evidence.

¶ 106    The question of whether an entity is adequately capitalized is based on the policy that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for the corporation's prospective liabilities, and moreover, that it is inequitable to allow shareholders to set up a flimsy organization just to escape personal liability. *Fontana*, 362 Ill. App. 3d at 504. A corporation's capitalization is a major consideration in deciding whether a legitimate separate corporate entity was maintained. *Amsted Industries, Inc. v. Pollak Industries, Inc.*, 65 Ill. App. 3d 545, 552 (1978). "An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability." (Internal quotation marks omitted.) *Jacobson*, 278 Ill. App. 3d at 1089.

¶ 107    Here, the evidence shows that neither SCI nor WSM were inadequately capitalized. According to William, SCI was initially capitalized with $1000. William further stated that his business was essentially service-oriented and that in theory, enough capital was always maintained to operate the business. William's testimony also suggested that SCI's capital fluctuated and at one time was at least $400,000. According to William, SCI was able to function and pay its bills until the Kansas judgment was entered. Defendants' expert, Picker, testified that there is no required minimum for capital unless a company has significant loan payments to make, significant investments in capital equipment, or significant recurring obligations, none of which were at issue here. Plaintiff points to SCI's line of credit as demonstrating that SCI was lacking in capital. However, SCI did not appear to rely on the line of credit to function. A large portion was used to loan and invest money in a hedge fund, for which SCI was eventually repaid, and another portion was used to pay off a condominium that served as collateral for the line of credit. Further, the line of credit was paid off in March 2006. There was no evidence that SCI did not have sufficient capital to run its basic business of acting as general partner and manager for the limited partnerships. As for WSM, William testified that it was initially capitalized with $10, but William also stated that when WSM was formed, 1,000 shares were issued for $1 per share. As of December 31, 2006, WSM's balance sheet showed assets of about $58,000 in cash. Like SCI, WSM principally performed management functions, and there was no evidence that WSM was unable to meet its obligations or carry out its duties. See *In re Estate of Wallen*, 262 Ill. App. 3d 61, 71 (1994) (unclear that corporation undercapitalized given nature of the business, where corporation acted merely as facilitator between buyers and sellers and did not maintain an inventory). Under these circumstances, SCI and WSM were adequately capitalized.

¶ 108    As for observing corporate formalities and maintaining corporate records, the evidence suggests that SCI and WSM were far from perfect, but not so flawed as to factor in favor of piercing the corporate veil. William testified that his entities produced corporate resolutions only when the bank required it, and moreover, corporate resolutions were not required for activities in the normal course of business. Because they were not required, there were no written corporate resolutions authorizing the purchase and sale agreement, the line of credit,

or the loan to the hedge fund. William could not recall whether a required shareholder's voting list was ever put together. Additionally, William recalled attending SCI director and shareholder meetings and stated that meetings for his entities were frequent, but that meeting minutes did not have to be recorded unless a lender required it. In addition, William testified that there were contracts that were not necessarily written, and he described an oral agreement with a landscaper. At the same time, William testified that long-term transactions were documented and that he would generally document transactions if he felt it was required. SCI and WSM had articles of incorporation and bylaws, and William stated that every entity had separate bank accounts, corporate filings, and annual reports. A number of these documents were produced at trial. William maintained that annual reports were filed for every corporation and that corporate formalities were followed when required by the bylaws, IRS, or Illinois law. Overall, though their practices resulted in fewer documents than might be desired, SCI and WSM appear to have observed basic corporate formalities and maintained various records, especially when it was required by a third party. *Contra Fontana*, 362 Ill. App. 3d at 506 (determination that corporation failed to keep and maintain corporate records not against manifest weight of evidence where there were no corporate resolutions whatsoever for certain loans, no notes or other evidence of claimed indebtedness, no corporate records of amounts borrowed for transactions, and defendant admitted he never had a written contract with a subcontractor, never took bids from subcontractors, and kept no financial records for any payments except for draw schedules filed with title companies).

¶ 109    The next factor, whether SCI, WSM, and William commingled funds and failed to maintain arm's-length relationships, also does not warrant piercing the corporate veil. What plaintiff contends is the use of the SCI line of credit for personal expenses was shown to be the line of credit's sweeping function at work. According to William, the SA account, which was William and Wendy's joint checking account, was linked to the SCI line of credit. William stated that if the SA account was overdrawn, money would automatically be lent to it, and ultimately SA borrowed and paid back money on an ongoing basis. William further stated that SCI could lend money to other people at its discretion, a proposition that plaintiff's expert, Rudnicki, agreed with. As to the other claims about SCI and WSM accounts being used for personal expenses, William explained that certain medical payments were part of a semi-medical plan and admitted that one of the corporations received subscriptions. Further, a payment to a recipient in Costa Rica was explained as likely coming from another account. William insisted that personal and business bills were paid out of their corresponding accounts and denied that SCI made personal payments. Moreover, while an E-Trade account and other assets were carried on SCI's books for a period of time, they were eventually removed–an occurrence that defendants' expert, Picker, testified was the subject of correction entries that were common for smaller corporations. Picker further stated that SCI's records had mistakes, but he did not see evidence of commingling.

¶ 110    Plaintiff also asserts that SCI and WSM operated from the same location, used the same employees, and performed the same management operations. Additionally, plaintiff notes that in 2006 and 2007, after WSM had taken over management functions, invoices were sent to SCI instead of WSM, but were paid by WSM. However, the trial court was entitled to accept William's explanations for these circumstances (see *Falcon v. Thomas*, 258 Ill. App. 3d 900, 909 (1994) (in a bench trial, the trial judge weighs the evidence and makes findings of fact)), and according to those explanations, SCI and WSM were separate. William testified

that because SCI remained the general partner, it was less confusing to have bills sent to it. William also mentioned the difficulties he had in explaining to whom bills should be sent, maintained that WSM paid the bills, and stated that each entity had separate bank accounts. We also note that evidence that the affairs of two corporations were interwoven relates to the liability between the two corporations, rather than the personal liability of an individual. *Amsted Industries, Inc.*, 65 Ill. App. 3d at 550.

¶ 111 Additionally, the use of the line of credit to pay off Wendy's mortgage and to loan $1 million to a hedge fund was also explained. According to William, the bank required that the mortgage on the condominium be paid off because the condominium was being used as collateral for the loan. Picker stated this was generally required by lenders. William further testified that the $1 million payment to the hedge fund was supposed to be a short interim loan and an investment. Again, there was testimony that SCI could lend money to third parties. Overall, although there was evidence that commingling occurred, such as testimony from plaintiff's expert, Rudnicki, we reiterate that in a bench trial, the trial judge weighs the evidence and makes findings of fact. *Falcon*, 258 Ill. App. 3d at 909. Further, we note that we will not disturb a trial court's judgment as long as there is evidence to support it. *Sharif*, 2014 IL App (1st) 133008, ¶ 25. A finding that SCI, WSM, and William did not commingle funds and maintained arm's length relationships was not against the manifest weight of the evidence.

¶ 112 Moving to the next consideration, there was conflicting evidence about whether SCI was insolvent and limited evidence that WSM was insolvent. According to plaintiff's expert, Rudnicki, SCI was insolvent throughout 2005 because the liability for the Kansas judgment had existed since the beginning of 2005 and when the Kansas judgment and line of credit were accounted for, SCI's liabilities exceeded its assets in 2005. Meanwhile, defendants' expert, Picker, stated that there was no indication in 2005 that SCI's liabilities exceeded its assets and that there were positive retained earnings and no deficit. For his part, William testified that SCI paid its bills and functioned until the Kansas judgment. According to William, SCI became insolvent around March 2006, when the line of credit was no longer available and the appeal process for the Kansas judgment ended. William also testified that WSM had been able to operate and pay its bills. As of December 31, 2006, WSM's balance sheet showed assets of about $58,000 in cash. In light of the conflicting opinions on the subject of solvency, the court was entitled to lend more weight to Picker's and William's views, in which SCI was not insolvent before the Kansas judgment. See *West Shore Associates, Ltd. v. American Wilbert Vault Corp.*, 269 Ill. App. 3d 175, 180 (1994) (it is function of trial judge to weigh conflicting evidence, consider the evidence in view of all the evidence in the case, and to make findings based on that evidence). Further, the evidence does not suggest that either entity was purposely kept insolvent while it operated. SCI and WSM were both able to do business, though during different times. *Contra People v. V&M Industries, Inc.*, 298 Ill. App. 3d 733, 741 (1998) (corporation insolvent where was insolvent at time of trial and was never adequately funded). That SCI was eventually drained of its assets speaks to another factor that is discussed below–whether SCI drained diverted assets to the detriment of creditors. Overall, a finding that SCI and WSM were solvent was not against the manifest weight of the evidence.

¶ 113 As we mention above, the evidence shows that SCI diverted assets to WSM to the detriment of a creditor, plaintiff. William, acting through SCI, made a deliberate effort after

the Kansas judgment to divert funds to avoid paying plaintiff. As a result of the Kansas judgment, a garnishment was served on SCI's bank account. William stated that, subsequently, money stopped being deposited in the account and that he directed that no money should flow through the account without his authorization. Further, shortly after the Kansas judgment, WSM began managing a significant number of properties that SCI had previously managed, which generated management fees for WSM–fees that SCI previously received. Meanwhile, SCI's account was zeroed out, with approximately $32,000 going to WSM. William also testified that after December 2005, SCI did not generate any business income that could have satisfied the Kansas judgment and that the running balance in SCI's account since 2005 had been around $1,000. Further, it was William who arranged for the transfer of SCI's income stream to WSM. Where SCI was the general or managing partner, he directed the limited partnerships to behave in a certain manner. As to the so-called independent limited partnerships, William's testimony described conversations and "some notification of our intent or what was going on," as well as his communicating that "from a practical point of view, I was saying *** we needed to move it over" due to the garnishment, a direct consequence of the Kansas judgment. The timing and method of using WSM to take over SCI's management functions and receive the corresponding income stream, while keeping SCI's assets low, strongly suggest that William, through SCI, diverted assets to avoid paying the Kansas judgment.

¶ 114     The evidence also suggests that SCI's and WSM's only other officer or director, Wendy, was nonfunctioning. Although Wendy testified that she felt some ownership in SCI, her other statements suggested that she deferred to William on all matters and was only superficially involved in SCI and WSM. Wendy testified that she did not recall the title of vice president being attributed to her when she signed loan documents for SCI and that she was not active in the business. When Wendy was asked to sign something, she would ask William questions and then sign the document if she was comfortable, though she also stated that she was given perfunctory explanations. Additionally, Wendy was unfamiliar with numerous aspects of SCI and WSM. Wendy testified that she "probably would not have paid attention" or did not remember that SCI was the general partner of various limited partnerships, which was a key feature of SCI. She did not know the amount of management fees that SCI received and stated that she would not know about any agreements between SCI and the limited partnerships. As to WSM, Wendy did not know when or why it was formed and did not recall being elected WSM's sole director. Wendy also did not recall attending meetings for SCI or WSM, though William testified to the existence of these meetings. Wendy's almost complete disengagement from SCI and WSM, except on paper, suggests that she was nonfunctioning.

¶ 115     Finally, we consider whether SCI and WSM were mere façades for the dominant stockholders. As to this factor, we agree with the trial court that SCI and WSM had a separate corporate existence from William. SCI and WSM had employees, filed tax returns, and functioned in their business of real estate management. SCI had existed since 1989 and records presented at trial showed that it had a track record of generating revenue. WSM, once it took over the management business, also generated positive revenue and appeared to actually manage properties, even though its origins were suspect. Though William controlled both entities, and at one point used WSM to avoid a judgment against SCI, it was not against

the manifest weight of the evidence to find that they were functioning businesses that had a history of performing specific functions, rather than mere shields for personal liability.

¶ 116 Overall, there was not such a unity of interest and ownership such that the separate personalities of SCI and William, and WSM and William, did not exist. See *Fiumetto*, 321 Ill. App. 3d at 958. Though SCI and WSM had a nonfunctioning director or officer and SCI diverted assets to WSM, the two entities still maintained separate identities from William. It was not unreasonable or arbitrary to find that the entities kept records and observed corporate formalities, albeit imperfectly, were adequately capitalized to serve their purposes, kept funds separate from William and Wendy's personal expenses, and were solvent while operating. Although we found that SCI violated the Fraudulent Transfer Act, here we considered the different question of whether William used SCI and WSM merely as an instrumentality to conduct his own business. See *Peetoom*, 334 Ill. App. 3d at 527. We acknowledge that SCI and WSM were not perfect, but plaintiff had to make a substantial showing that they were a dummy or sham for William (see *Jacobson*, 278 Ill. App. 3d at 1088), which it failed to do. Based on the consideration of the factors discussed above, the trial court's finding that William was not an alter ego for SCI and WSM was not against the manifest weight of the evidence.

¶ 117                                    F. Attorney Fees

¶ 118 Lastly, defendants assert that the trial court should not have awarded attorney fees against SCI, WSM, and Anderson because there was no statutory authority for doing so and none of those entities had a contract with the bank that provided for attorney fees. Defendants argue that the Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)) does not authorize fee awards. Additionally, defendants contend that WALP was the obligated party responsible for fees in the Kansas case and no other defendants agreed to fee-shifting. Defendants further argue that the fee petition was required to differentiate between the hours spent on fee-shifting claims and fees sought pursuant to a statute. Additionally, defendants assert that the court should have reduced the fees because plaintiff did not prevail on all claims, the fee petition contained vague and ill-defined tasks, and the fee petition contained improper overhead, such as travel expenses, long distance charges, computerized legal research, paralegal and secretarial work, and copying expenses. Defendants also assert that the court did not entertain their request for an evidentiary hearing.

¶ 119 Generally, Illinois courts follow the "American Rule," which provides that each party must bear its own attorney fees and costs, absent statutory authority or a contractual agreement. *Country Mutual Insurance Co. v. Styck's Body Shop, Inc.*, 396 Ill. App. 3d 241, 251 (2009). Additionally, a trial court has broad discretion in awarding attorney fees, and we will not reverse a decision about attorney fees absent an abuse of that discretion. *Timan v. Ourada*, 2012 IL App (2d) 100834, ¶ 29.

¶ 120 There are two grounds that plaintiff relies on to justify its attorney fees: the Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2006)) and the Kansas judgment and underlying loan documents. Initially, we note that a statute or contract must allow for attorney fees by specific language, such that the provision at issue must specifically state that "attorney fees" are recoverable. *Negro Nest, LLC v. Mid-Northern Management, Inc.*, 362 Ill. App. 3d 640, 642 (2005).

¶ 121    We disagree with plaintiff's contention that attorney fees are recoverable as punitive damages under the Fraudulent Transfer Act. Plaintiff cites section 8 of the Fraudulent Transfer Act, which states that a creditor may obtain "any other relief the circumstances may require" (740 ILCS 160/8(a)(3)(C) (West 2006)), and asserts that Illinois permits trial courts to award punitive damages. However, plaintiff has failed to provide an Illinois case where attorney fees were granted under the Fraudulent Transfer Act. In fact, two cases have specifically rejected such claims, though we acknowledge that those two cases predate the current version of the Fraudulent Transfer Act. See *Kardynalski v. Fisher*, 135 Ill. App. 3d 643, 649 (1985) (denying plaintiff's claim for attorney fees "for want of statutory authority"); *Anderson v. Ferris*, 128 Ill. App. 3d 149, 156 (1984) (plaintiff not entitled to attorney fees where complaint neither specifically sought punitive damages nor did plaintiff cite any Illinois authority that would authorize such damages for this type of action). Although here, plaintiff sought punitive damages in its complaint, the circumstance remains that the current version of the Fraudulent Transfer Act does not specify that attorney fees are recoverable and Illinois courts generally refuse to allow recovery for attorney fees unless the statute specifically states that "attorney fees" are recoverable. See *Negro Nest, LLC*, 362 Ill. App. 3d at 649. We decline to follow plaintiff's cited cases from other states that provide for attorney fees or punitive damages for a fraudulent transfer claim. Though out-of-state cases should be examined when relevant, decisions of the reviewing courts of foreign jurisdictions are not binding on Illinois courts. See *Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.*, 210 Ill. App. 3d 231, 239 (1991).

¶ 122    Plaintiff also contends that the Kansas judgment and underlying loan documents permit attorney fees. This argument has some merit. The mortgage note stated that if it became necessary to employ counsel to collect or enforce the debt or protect or foreclose the security for the debt, the "Maker also shall pay on demand all costs of collection ***, including attorneys' fees and costs reasonably incurred for the services of counsel." SCI signed the note as WALP's general partner. The Kansas court subsequently found SCI jointly and severally liable for all of WALP's debts, obligations, and judgments, which included attorney fees. The judgment also provided for "other expenses accrued and accruing, including reasonable attorneys' fees" and stated that plaintiff had incurred and would continue to incur substantial costs in attempting to collect the judgment, including the "reasonable attorneys' fees related to Plaintiff's collection efforts." As plaintiff asserts, this language could justify an award of attorney fees both for the Kansas judgment and the proceedings in Cook County to enforce that judgment. See *Poilevey v. Spivack*, 368 Ill. App. 3d 412, 416 (2006) (judgment supported award of postjudgment attorney fees where one clause specifically awarded specific amount of fees and costs and other clause provided for " 'reimbursement for reasonable attorney fees and costs of collection' "). Additionally, it could be argued that because WSM was found to be a mere continuation of SCI, it could also be held responsible for attorney fees. A corporation that went "through a mere change in form without a significant change in substance *** should not be allowed to escape liability." (Internal quotation marks omitted.) *Vernon v. Schuster*, 179 Ill. 2d 338, 346 (1997).

¶ 123    At the same time, the Kansas judgment provided for "reasonable attorneys' fees related to [plaintiff's] collection efforts," and the trial court's ruling did not explain whether the entirety of the proceedings in Cook County fell into that category. This matter involved years of litigation over a number of issues, and yet the court's orders on fees were sparse and did

not indicate on what basis plaintiff was awarded fees against SCI, WSM, and Anderson. It would have been particularly helpful to have the court's reasoning where Anderson was not found to be a mere continuation of another Spatz-related entity. Where, as here, we review the court's fee order for an abuse of discretion (*Timan*, 2012 IL App (2d) 100834, ¶ 29), we decline to speculate how broad the reach of the Kansas judgment and loan documents are without some explanation from the trial court.

¶ 124        Further, the court's order does not contain any indication of whether the requested fees were reasonable, an inquiry that involves multiple considerations. Only those fees that are reasonable are allowed, the determination of which is left to the trial court's sound discretion. *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 983 (1987). Further, the party seeking the fees always bears the burden of presenting sufficient evidence from which the trial court can render a decision as to their reasonableness. *Id*. Rather than presenting a mere compilation of hours multiplied by a fixed hourly rate or bills issued to the client, the petition for fees must specify the services performed, by whom they were performed, the time expended, and the hourly rate charged. *Id*. at 984. The trial court should also consider a variety of additional factors, such as the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the matter's importance, the degree of responsibility required, the usual and customary charges for comparable services, and the benefit to the client. *Id*. Additionally, the trial court "should also consider whether there is a reasonable connection between the fees and the amount involved in the litigation." (Internal quotation marks omitted.) *Heller Financial, Inc. v. Johns-Byrne Co.*, 264 Ill. App. 3d 681, 691 (1994).

¶ 125        Additionally, where a case involves some claims filed pursuant to statutes that allow for attorney fees and others not, the fee petition must distinguish between the hours spent on the statutory fee-shifting claims and the other claims. *Country Mutual Insurance Co.*, 396 Ill. App. 3d at 252. Moreover, one factor that may shift an award of fees upward or downward is the result that the plaintiff obtained, which is an important consideration when the plaintiff only prevailed on some of its claims. *Id*. at 253. There, the court must decide whether the unsuccessful claims were related to the successful claims and whether based on the level of success achieved, the hours reasonably expended were a satisfactory basis for making a fee award. *Id*.

¶ 126        As to overhead expenses, which defendants also challenge as appearing in plaintiff's fee petition, we note that expenses that an attorney regularly incurs regardless of specific litigation, including telephone charges, in-house delivery charges, in-house photocopying, check processing, newspaper subscriptions, and in-house paralegal and secretarial assistance, are not recoverable as costs of litigation. *Johnson v. Thomas*, 342 Ill. App. 3d 382, 401 (2003). These overhead expenses refer mainly to fixed expenses that are already reflected in an attorney's hourly rate and should not be apportioned to any single cause of action so as to constitute an additional charge. *Id*. at 402. However, this definition of overhead does not include charges for expenses specially incurred to third parties specifically in furtherance of a particular cause of action. *Id*. As an aside, the fee for computerized legal research does not fall neatly within the categories of overhead versus outside expenditures and some courts have made a distinction based on the billing method for each individual case. *Id*. at 403.

¶ 127        Here, the record does not indicate whether the trial court considered any of the above factors when it ruled on plaintiff's fee petition. As noted above, plaintiff's actual fee petition

- 33 -

was not in the record, which makes it unclear on what specific bases plaintiff sought fees. Moreover, plaintiff did not respond in its reply brief to defendants' arguments regarding the reasonableness of the requested fees. Also troubling is that defendants were apparently denied an evidentiary hearing that they requested in their response to plaintiff's fee petition. The purpose of an evidentiary hearing is to provide sufficient information to allow the court to assess intelligently the reasonableness of the fees charged (*Heller Financial, Inc.*, 264 Ill. App. 3d at 691), which would have been quite helpful here. Although a previous order stated that a hearing was scheduled, the court's orders of June 25, 2013, and July 10, 2013, both indicate that the court heard "arguments" from the parties and do not mention a hearing or state that the fees were found to be reasonable. Generally, in protracted litigation involving multiple complex issues, an evidentiary hearing should be conducted on the request of the losing party, especially if the prevailing party was represented by multiple attorneys, which may have resulted in duplicative charges, and where the prevailing party was entitled to fees and costs with respect to some claims, but not others. *Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1058 (2007). Both of those circumstances were at play in this matter. See also *Bank of America National Trust & Savings Ass'n v. Schulson*, 305 Ill. App. 3d 941, 952 (1999) (when a party who must pay attorney fees asks for an evidentiary hearing, he is entitled to one). Moreover, the reasonableness of fees is a matter of proof, and a party ordered to pay attorney fees has the right to conduct meaningful cross-examination on the issue (*id.*), which apparently did not occur here.

¶ 128    The trial court's order leaves many unanswered questions. The appendix to the fee petition was voluminous, it contained charges that appear to qualify as overhead expenses, and many of the entries are redacted. The record does not contain reports of proceedings for June 25, 2013, and July 10, 2013, when the orders related to the fee petition were entered. The trial court's orders gave no indication of the basis for awarding fees or whether it considered the many factors at work in deciding whether the attorney fee award was reasonable, and yet plaintiff was awarded all of its requested fees. We recognize that it is the appellant's burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and that in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with the law and had a sufficient factual basis. *Foutch*, 99 Ill. 2d at 391-92. At the same time, trial judges must also justify the substance of their decisions, either orally or in writing, and explaining a ruling instills confidence in the impartiality and fairness of the judge and enhances respect for the courts. *Turczak v. First American Bank*, 2013 IL App (1st) 121964, ¶ 19. Here, because the court's orders give no indication of the basis for its decision, contained no finding of whether the fees were reasonable, and at the very least, a number of entries in the fee petition appendix appear suspect, we simply cannot determine whether the trial court abused its discretion. But *cf. Chicago Title & Trust Co. v. Chicago Title & Trust Co.*, 248 Ill. App. 3d 1065, 1072-73 (1993) (although defendants did not provide transcript of the hearing or of the trial judge's comments when fees were awarded, the court made an independent assessment of the propriety of fees where it appeared that the court carefully examined the affidavits and time records submitted, the order specified that the award represented a reasonable fee, and there were no affidavits or testimony that contradicted the trial court's finding). Accordingly, we vacate the fee award and remand the matter to the trial court to explain the basis for

awarding fees and for an evidentiary hearing on attorney fees.

¶ 129                        III. CONCLUSION

¶ 130       For the foregoing reasons, we affirm the circuit court's judgment on the issues of collateral estoppel, the Fraudulent Transfer Act, and alter ego. We vacate the fee award and remand on the issue of attorney fees.

¶ 131       Affirmed in part; vacated and remanded in part.